UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                          CRIMINAL ACTION

VERSUS                                            NO. 16-32

LOUIS AGE JR.                                     SECTION M (1)
LOUIS AGE III
        a/k/a "Big Lou"
RONALD WILSON JR.
KENDRICK JOHNSON
STANTON GUILLORY
        a/k/a "Nan Nan"

## ORDER & REASONS

Before the Court is a motion by defendants Louis Age Jr., Louis Age III, Ronald Wilson

Jr., Kendrick Johnson, and Stanton Guillory (collectively, "Defendants") to quash the indictment

and stay proceedings due to alleged substantial failure to comply with the provisions of the Jury

Service and Selection Act ("JSSA"), 28 U.S.C. §§ 1861-1878, and a violation of the fair-cross-

section guarantee of the Sixth Amendment "because, as a result of systematic exclusion, the

representation of black prospective jurors in the qualified list, jury pools and venires from which

petit and grand juries are selected in the Eastern District of Louisiana is not fair and reasonable in

relation to the number of such persons in the community."[1]  The United States of America (the

"Government") responds in opposition,[2] and Defendants reply in further support of their motion.[3]

This Court also permitted the Clerk of Court for the United States District Court for the Eastern

District of Louisiana (the "Clerk") to provide to the Court and the parties any relevant factual

information concerning the Court's jury-selection process, including any statistical analysis and

---

[1] R. Doc. 483.  Defendant Louis Age Jr. filed the original motion in which all other co-defendants joined.
*See* R. Docs. 488, 491 & 492.  Thereafter, Age Jr. filed a supplemental motion to quash.  R. Doc. 514.
[2] R. Doc. 520.
[3] R. Doc. 525.

related data, and an expert report.[4]  Having considered the parties' memoranda, the record, and the

applicable law, the Court denies Defendants' motion, holding that neither the district's jury plan,

nor its implementation in constructing the jury wheels from which the grand jury that indicted the

Defendants was selected, entails a violation of the fair-cross-section guarantee of the Sixth

Amendment or the JSSA.[5]

## I.   BACKGROUND

### A.  The *Age* Case

On February 26, 2016, the grand jury returned an indictment charging Guillory with one

count of murder for hire in violation of 18 U.S.C. §§ 1958 and 2 arising from the July 27, 2012

murder of Milton Womack.[6]  Then, on August 17, 2017, the grand jury returned a superseding

indictment charging Guillory and four co-defendants, Age Jr., Age III, Wilson, and Johnson, with

various counts arising from Womack's murder.[7]  At the time of the murder, Womack was a co-

---

[4] The Clerk moved to intervene, or alternatively, participate as *amicus curiae*.  R. Doc. 493.  Although the Clerk withdrew the motion to intervene, she maintained the motion to participate as *amicus curiae* or in another fashion to provide statistical and factual data about the Court's jury-selection system.  R. Doc. 505.  This Court denied the motion as to *amicus curiae* participation but allowed the Clerk to provide factual information and an expert report.  R. Doc. 506.  The Clerk provided both a letter response relating facts concerning the Court's jury-selection process and an expert report (submitted in the form of a declaration).  *See* Clerk's April 2, 2021 Letter (R. Doc. 528-5 at 1-13); Expert Report of Tumulesh K.S. Solanky ("Solanky Report") (R. Doc. 528-5 at 14-71).  This information was considered by the Court along with the Clerk's responses to Age Jr.'s requests for production of records.

[5] There is no need for an evidentiary hearing because the evidence presented by the parties and produced by the Clerk contains no real conflicts.  The statistics and statistical analyses presented by the various experts are remarkably similar.  To the extent there are any slight differences, the Court has based its analysis on the statistics presented by Defendants and those reported by the Clerk in her official reports.

[6] R. Doc. 3 at 1.

[7] R. Doc. 52.  Count 1 charges Defendants with conspiring to commit murder for hire, in violation of 18 U.S.C. § 1958.  Count 2 charges Defendants with using a facility of interstate commerce (a cell phone) to commit murder for hire, in violation of 18 U.S.C. §§ 1958 and 2.  In Count 3, Defendants are charged with conspiring to murder Womack to prevent him from testifying in a Medicare fraud case, in violation of 18 U.S.C. §§ 1512(a)(3)(A) and 1512(k).  Count 4 charges Defendants with killing Womack to prevent him from testifying in the Medicare fraud case, in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(3)(A), and 2.  Count 5 charges Age Jr. and Age III with killing Womack to prevent him from communicating with law enforcement about his knowledge of the Medicare fraud scheme, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(3)(A), and 2.  In Count 6, Defendants are charged with conspiring to murder Womack in retaliation for his cooperation in a Medicare fraud case, in violation of 18 U.S.C. §§ 1513(a)(2)(A) and 1513(f).  Count 7 charges Defendants with killing Womack in retaliation for his cooperation with law enforcement, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(A), and 2.  Count 8 charges Johnson, Age Jr., and Age III with conspiring to use intimidation, threats, and corrupt persuasion to influence, delay, or prevent testimony in the Medicare fraud case and with hindering, delaying, and preventing further communication with law

defendant with Age Jr. in a Medicare fraud case filed in the United States District Court for the Middle District of Louisiana, styled *United States v. Louis T. Age, Jr., et al.*, Criminal Action No. 11-105.  Womack was murdered two days after documents were filed in the Medicare fraud case indicating that he was changing his plea to guilty.  The Government's theory of the case at bar is that Defendants conspired to murder Womack in retaliation for his past cooperation in the Medicare fraud case and to prevent him from testifying at the trial in that matter.  Particularly, the Government contends that Age Jr., Age III, Johnson, and Wilson hired Guillory, an alleged member of various New Orleans gangs, to murder Womack.  The jury trial of this matter is scheduled to begin on January 24, 2022.[8]

In late 2019, Age Jr. moved pursuant to the JSSA, 28 U.S.C. § 1867(f),[9] for this Court to order the Clerk to produce certain records and papers used in connection with the jury-selection process.[10]  Age Jr.'s specific requests were detailed in an attachment to his motion, but generally, he sought information related to the grand jury that returned the indictment against him in 2017, the petit jury that will try the case, and jury selection under the most recently emptied master jury wheel.[11]  This Court granted Age Jr.'s motion by ordering the Clerk to permit Age Jr.'s attorney to inspect, reproduce, and copy existing documents or reports, readily generated by the jury management system, that were responsive to specific topics related to the grand jury that returned

---

enforcement relating to the commission or possible commission of a federal offense (healthcare fraud), all in violation of 18 U.S.C. § 1512(k).  In Count 9, Johnson, Age Jr., and Age III are charged with conspiring to retaliate against a witness for aiding law enforcement in the Medicare fraud case, in violation of 18 U.S.C. § 1513(f).  Count 10 charges Johnson with making false statements to the grand jury regarding Womack's murder, in violation of 18 U.S.C. § 1623.  In Count 11, Age III is charged with making false statements to FBI agents in violation of 18 U.S.C. § 1001.

[8] R. Doc. 498.

[9] This law provides that when a defendant intends to file a motion to dismiss the indictment or stay the proceedings on the ground that the jury was not selected in compliance with the JSSA, he is entitled to "inspect, reproduce, and copy [the contents of records or papers used by the jury commission or clerk in connection with the jury-selection process] at all reasonable times during the preparation and pendency of such a motion."  28 U.S.C. § 1867(f).

[10] R. Doc. 340.

[11] R. Doc. 340-2.

3

the indictment in 2017 and the petit jury that might try the case.[12]  In response to the Court's order, the Clerk provided the requested information to the parties and the Court in the form of a letter, documents, and two compact discs.[13]  The letter provided some explanation, but not legal argument, for the factual information provided.[14]

In March 2021, Age Jr. filed an unopposed motion asking this Court to order the Clerk to supplement its production with certain additional jury-selection records, including machine-readable versions of data already supplied.[15]  The Court granted the motion limited to those records that pre-existed the internal review of the Court's jury systems conducted by the Administrative Office of the United States Courts in 2020.[16]

## B.  The Court's Jury Plan

The Court's jury plan in effect when the 2017 superseding indictment was issued sets forth the procedures the Clerk used to select potential grand jurors.[17]  Striving to select grand and petit jurors at random from a fair cross-section of the community, the jury plan provided for the creation of a master jury wheel drawn at random from a combined voter registration list of each parish in the district.[18]  Names from the voter registration list were to be selected at random and placed in the master jury wheel, with each of the district's thirteen parishes proportionally represented.[19]  To

---

[12] R. Doc. 384.

[13] Age Jr. acknowledges that the Clerk's production was voluminous, constituting "75 electronic files, made up of 166,669 pages of PDF documents, 6 Excel spreadsheets, 1 Word document and a 24 page transmittal letter."  R. Doc. 507-1 at 2.

[14] Clerk's July 14, 2020 response to Age Jr.'s motion for production of jury-selection records ("Clerk's July 2020 Response") at 1 (R. Doc. 528-1 at 1-24).

[15] R. Doc. 507.

[16] R. Doc. 511.

[17] E.D. La. Plan for Random Selection of Grand and Petit Jurors Pursuant to the Jury Selection and Service Act of 1968, effective Jan. 10, 2013 ("Jury Plan") produced as Sched. I No. 1 with Clerk's July 14, 2020 Response at 1 (R. Doc. 528-1 at 25-37).

[18] Jury Plan at 1-3 (R. Doc. 528-1 at 25-27).  The thirteen parishes comprising the Eastern District of Louisiana include Assumption, Jefferson, Lafourche, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Tammany, Tangipahoa, Terrebonne, and Washington.  28 U.S.C. § 98(a).

[19] Jury Plan at 4-5 (R. Doc. 528-1 at 28-29).  Under the plan, the master jury wheel was to be emptied and refilled every four years.

build a qualified jury wheel, the Clerk, from time to time, would then draw from the master jury wheel the names of as many persons as were required for jury service, and send to those persons juror qualification forms to complete and return.[20]  If a juror qualification form was not returned, it was the Clerk's practice to send a second juror qualification form "along with more strongly worded instructions" that the recipient complete and return it.[21]  The Clerk was empowered to summon for appearance any person who failed to return a completed juror qualification form.[22]

The returned juror qualification forms are used to determine whether a person qualifies to serve as a juror.[23]  Under the jury plan, a person is qualified to serve as a grand or petit juror unless he or she: (1) is not a citizen of the United States 18 years of age or older who has resided for one year within the district; (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form; (3) is unable to speak the English language; (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or (5) has a charge pending against him or her for the commission, or has been convicted in a state or federal court, of a crime punishable by imprisonment for more than

---

[20] *Id.* at 5 (R. Doc. 528-1 at 29).  These forms are sometimes referred to as questionnaires.  Clerk's April 2, 2021 Letter at 4 (R. Doc. 528-5 at 4).  Recipients receive instructions for completing the form, and they are advised that they may seek help in filling out the form and may submit their answers electronically through e-Juror on the Court's website.  *Id.* at 4 & n.18 (R. Doc. 528-5 at 4 & n.18).

[21] *Id.* at 4 (R. Doc. 528-5 at 4).

[22] Jury Plan at 6 (R. Doc. 528-1 at 30).

[23] *Id.* at 9-10 (R. Doc. 528-1 at 33-34).

one year and his or her civil rights have not been restored.[24]  The returned juror qualification forms would also be used to review requests for excuses[25] and exemptions[26] from jury service.

Under the plan, the names of at least 300 persons who were qualified to serve, and not excused or exempt, were to be placed on the qualified jury wheel.[27]  From time to time, the Clerk was to draw at random from the qualified jury wheel the names of the number of persons required for assignment to grand and petit jury pools.[28]  Those persons were then served summonses by mail or electronic means, or personally by the United States Marshal, if necessary.[29]  The qualified jury wheel was to be emptied and refilled every four years between the date of the November general election and the following 1st day of October.[30]

Grand or petit jury panels were then selected at random from the qualified jurors who complied with the summonses.[31]

## C. The Creation of the Relevant Master and Qualified Jury Wheels

The grand jury that issued the 2017 superseding indictment was empaneled on May 5, 2017.[32]  It was drawn from a master jury wheel that was filled on December 15, 2016, with the names of 60,000 citizens selected at random on November 30, 2016, from the source list of

---

[24] *Id.* at 8 (R. Doc. 528-1 at 32).

[25] *Id.* at 6-7 (R. Doc. 528-1 at 30-31).  The jury plan provided that the following persons could be excused from jury service: (1) anyone actively engaged in the operation of a one-person business; (2) anyone having active care and custody of a child or children under 10 years of age whose health or safety would be jeopardized by his or her absence for jury service, or anyone who is essential to the care of an aged or infirm person; (3) full-time students; (4) anyone over 70 years of age; (5) volunteer safety personnel who serve without compensation as firefighters or members of a rescue squad or ambulance crew for a public agency; (6) federal law enforcement officers; and (7) anyone who has, within the past two years, served on a federal grand or petit jury panel.

[26] *Id.* at 7-8 (R. Doc. 528-1 at 31-32).  The jury plan exempted from jury service: (1) active-duty military personnel; (2) fire and police personnel; and (3) certain public officers.

[27] *Id.* at 8 (R. Doc. 528-1 at 32).  The Clerk typically keeps the names of approximately 2,000 qualified jurors on the qualified jury wheel.  Clerk's April 2, 2021 Letter at 5 (R. Doc. 528-5 at 5).  "[A]s a matter of practice, the Qualified Wheel is an ever-changing wheel, as qualified jurors are added to the Qualified Wheel and jurors are randomly summoned for service in pools or panels."  *Id.*

[28] Jury Plan at 9 (R. Doc. 528-1 at 33).

[29] *Id.*

[30] *Id.* at 8 (R. Doc. 528-1 at 32).

[31] Clerk's April 2, 2021 Letter at 6 (R. Doc. 528-5 at 6).

[32] R. Doc. 528-1 at 94.

registered voters in the district.[33]  According to the Clerk's AO-12 Report on Operation of the Jury

Selection Plan for this master jury wheel, the percentage of "Black or African American" citizens,

age 18 or over, in the citizen population of the district was 31.10%, and the percentage of black

citizens on the master wheel was 30.59%.[34]

Pursuant to the jury plan, the qualified jury wheel was built beginning with the random

drawing of 8,000 names from the master jury wheel and the mailing of questionnaires to each of

these prospective jurors on December 19, 2016.[35]  Of the 8,000 forms mailed, the AO-12 reflects

that 3,704 were completed and returned, 457 were returned as undeliverable, and 3,839 were not

yet returned as of the date the returned forms were sampled (*i.e.,* March 31, 2017).[36]  Of the 3,704

questionnaires completed and returned, 1,992 were for persons placed in the qualified wheel.[37]

Presumably, the balance of the forms (1,712) were for persons who were not qualified for, excused

from, or exempt from jury service; or who were deceased, had duplicate records, had moved out

of district, or needed to provide more information.[38]  The AO-12 reports that the percentage of

Black or African-American citizens on the qualified jury wheel as of the date of sampling was

19.26%.[39]

---

[33] R. Doc. 483-4 at 220; Clerk's July 2020 Response at 3-4 (R. Doc. 528-1 at 3-4).

[34] R. Doc. 483-4 at 220-21; E.D. La. AO-12 dated 05-26-17, Sched. I No. 8.b (full copy of AO-12 and related reports, including report reflecting composition breakdown of 60,000 [tallied as 59,999 due to one duplicate] names drawn for master jury wheel on November 30, 2016) to Clerk's July 2020 Response (R. Doc. 528-1 at 57-68). Professor Solanky's figures for the proportion of African-American citizens on the 2017 master jury wheel (30.13% for the 2017 master wheel and 30.84% for the 2019 supplement) are nearly the same.  Solanky Report at 7 (R. Doc. 528-5 at 21).

[35] R. Doc. 483-4 at 220.

[36] *Id.*  "Non-responded questionnaires are re-mailed after enough time has elapsed for the participant to respond and for the response to be recorded and analyzed by Jury Unit personnel.  There is no set time or schedule for this to occur but, typically, a minimum of six months after the initial mailing is allowed for response before a second questionnaire is mailed."  Clerk's July 2020 Response at 6 (R. Doc. 528-1 at 6).

[37] R. Doc. 483-4 at 221.

[38] *See infra* note 42 and accompanying text (AO-12 for May 26, 2017 sample and related reports listing these categories).

[39] R. Doc. 483-4 at 221.

Between March 31, 2017, and May 26, 2017, to supplement the qualified jury wheel, another 8,000 names were drawn from the master jury wheel and mailed questionnaires.[40]  Of the total of 16,000 forms mailed by then (*i.e.,* 8,000 from the first drawing and another 8,000 from the second), the pertinent AO-12 reflects that 5,584 were completed and returned, 749 were returned as undeliverable, and 9,667 were not yet returned as of the date the returned forms were sampled (*i.e.,* May 26, 2017).[41]  Of the 5,584 questionnaires completed and returned, 3,026 were for persons placed in the qualified wheel (including 834 persons listed as qualified and 2,192 listed as summoned), 666 were for persons who were not qualified to serve as jurors, 1,717 were for persons who were excused, 58 were for persons who were exempt, and 117 were for persons who were deceased, had duplicate records, had moved out of district, or needed to provide more information.[42]  The AO-12 reports that the percentage of Black or African-American citizens on the qualified jury wheel as of the May 26, 2017 date of sampling was 19.30%.[43]

Thereafter, the qualified jury wheel was supplemented with several other drawings at random, which at the next sampling date of March 21, 2019, included 48,000 of the original 60,000 names in the master jury wheel.[44]  Of the total of 48,000 forms mailed as of that date, the AO-12 reflects that 23,414 were completed and returned, 4,248 were returned as undeliverable, and 20,339 were not yet returned as of the date the returned forms were sampled (*i.e.,* March 21,

---

[40] E.D. La. AO-12 dated 05-26-17, Sched. I No. 8.b (full copy of AO-12 and related reports) to Clerk's July 2020 Response, p. 1 (R. Doc. 528-1 at 57).  Professor Solanky found that "[t]he percentages of African Americans and Whites in the sample to whom questionnaires were issued are quite similar – as one would expect them to be – to their respective percentages in the Master Wheels.  For example, in the 2017 Master Wheel, 30.10% of the questionnaires issued were sent to African Americans, a statistic commensurate with that group's population on the Master Wheel of 30.13%."  Solanky Report at 8 (R. Doc. 528-5 at 22).

[41] E.D. La. AO-12 dated 05-26-17, Sched. I No. 8.b (full copy of AO-12 and related reports) to Clerk's July 2020 Response, p. 1 (R. Doc. 528-1 at 57).

[42] *Id.* at eighth page in stapled packet (reflecting "wheel detail status report") (R. Doc. 528-1 at 64).  The persons identified as not qualified to serve as jurors are broken into seven separate "disqualified" categories; those identified as excused into six separate "excused" categories; and those exempt into three separate "exempt" categories.

[43] *Id.* at p. 2 (R. Doc. 528-1 at 58).

[44] E.D. La. AO-12 dated 03-21-19, Sched. I No. 8.c to Clerk's July 2020 Response, p. 1 (R. Doc. 528-1 at 69).

2019).[45]  Of the completed and returned questionnaires indicating race, the AO-12 reports that the percentage of Black or African-American citizens as of the March 21, 2019 date of sampling was 20.21%.[46]

### D.  The Parties' Contentions on the Motion to Quash

On January 18, 2021, Age Jr. filed the instant motion to quash the indictment and stay the proceedings arguing that the statistical disparities concerning African-American citizens in the qualified jury wheel demonstrate that there was a violation of the Sixth Amendment's fair-cross-section guarantee and a substantial failure to comply with the JSSA.[47]  The other co-defendants adopted Age Jr.'s motion.[48]  In particular, Defendants object to the qualified jury wheel from which their grand jury venire was selected, arguing that it violated the Sixth Amendment's fair-cross-section guarantee and the JSSA in its alleged substantial underrepresentation of African-American citizens by an absolute disparity of 11.84%.[49]  In calculating this disparity, Defendants compare the percentage of African-American citizens on the relevant qualified jury wheel (19.26%) with the percentage of such citizens 18 years or older in the district's population (31.1%), as shown on the Clerk's AO-12 form dated March 31, 2017.[50]  Defendants also posit that these numbers reflect a comparative disparity of 38.1%, and that the result is 11 standard deviations below the number of African-American jurors expected to be on the qualified jury wheel.[51]  Defendants argue that

---

[45] *Id.*

[46] *Id.*, p. 2 (R. Doc. 528-1 at 70).  Based on his review of the data, Professor Solanky found that African Americans constituted 21.99% of the 3,482 jurors qualified for the 2017 wheel and 22.35% of the 1,174 jurors qualified for the 2019 supplement to that wheel.  Solanky Report at 12 (R. Doc. 528-5 at 26).  Nevertheless, for purposes of the analysis in this opinion, the Court will use the figure of 19.30% reported on the AO-12 as of the March 2017 sample.

[47] R. Doc. 483.  On April 23, 2021, Age Jr. filed a supplemental motion to quash.  R. Doc. 514.

[48] R. Docs. 488, 491 & 492.

[49] R. Docs. 483-1 at 4-5; 483-2 at 4; 514-1 at 5; 525-1 at 2.  Defendants concede that the relevant master jury wheel had a representative racial makeup.  R. Doc. 483-2 at 2.

[50] R. Docs. 483-1 at 4 & 9; 483-2 at 2-3; 514-1 at 5 & 10.  The demographic data is gleaned from a 2015 census population table.  R. Doc. 483-2 at 1-2 (citing Sched. I Nos. 9.a & 8.a to Clerk's July 2020 Response); *see also* R. Doc. 514-2 at 2-3.

[51] R. Docs. 483-1 at 4-5 & 9; 514-1 at 5-6 & 10; 525-1 at 2.

the constitutional and JSSA violations are further evidenced by the underrepresentation of African-American citizens in all 136 jury pools drawn in the Eastern District of Louisiana from September 2013 to May 2021.[52]   According to Defendants' calculations, African Americans made up 20.94% of the prospective jurors collectively selected from the qualified jury wheel for the 136 jury pools, which amounts to an absolute disparity of 10.16% and a comparative disparity of 32.67% (using the 31.1% population figure for the district's population).[53]   This, they contend, is 48 standard deviations below the number of black prospective jurors expected to have been included in the 136 jury pools.[54]   According to Defendants, even absent a showing "that black prospective jurors are being barred from jury service by an explicit race-based bar on service," these statistics prove that there is a systematic exclusion of such citizens from the qualified jury wheel in violation of the Sixth Amendment and the JSSA.[55]

In opposition, the Government argues that the Defendants cannot prove a violation of the Sixth Amendment or the JSSA because the master jury wheel is randomly selected from an approved source – the voter registration lists – and reflects the proportion of African-American citizens in the community.[56]   The Government points out that the absolute disparity appears in the qualified jury wheel which introduces the non-random, external element of a citizen's choice not to return the juror qualification form.[57]   The Government maintains that this non-random, external element is not the result of anything in the jury plan or anything the Clerk did, nor is it something the Clerk can control.[58]   The Government argues that the attendant absolute disparity is thus not

---

[52] R. Docs. 483-1 at 5 & 9-10; 514-1 at 6 & 10-11.   During this time span, 49,866 prospective jurors were drawn from the qualified jury wheel for the 136 jury pools.  R. Docs. 483-2 at 7; 514-1 at 6.
[53] R. Docs. 483-1 at 5 & 9-10; 483-2 at 7; 514-1 at 6 & 10-11; 525-1 at 2.
[54] R. Docs. 483-1 at 5 & 9-10; 483-2 at 7; 514-1 at 6 & 11-12; 525-1 at 2.
[55] R. Docs. 483-1 at 11-13; 525 at 3-7.
[56] R. Doc. 520 at 12-25.
[57] *Id.*
[58] *Id.*

inherent in the jury-selection system, but rather the result of citizens' individual choices not to participate in the system.[59]  The Government also cites Fifth Circuit precedent to argue that an absolute disparity of 11.84% is on par with disparities previously held to comply with the Sixth Amendment and the JSSA.[60]  Further, the Government argues that the Defendants cannot use socioeconomic status to show a Sixth Amendment or JSSA violation because that status has not been held to be a distinctive group for the purpose of a fair-cross-section challenge and is not a statistic the Clerk tracks.[61]

### E.  The Clerk's April 2, 2021 Letter and the Solanky Report[62]

On April 2, 2021, the Clerk provided to the parties and the Court a letter and an expert report authored by statistician Tumulesh K.S. Solanky, Ph.D.[63]  In her letter, the Clerk describes the district's jury-selection process, from obtaining the voter registration source list from the Louisiana Secretary of State, to creating the master jury wheel, to the qualification process for jurors and creation of the qualified jury wheel, and eventually to the selection of grand and petit jurors.[64]  The Clerk also discusses the fair-cross-section requirement and the JSSA before

---

[59] *Id.*

[60] *Id.* at 25-28.

[61] *Id.* at 28-31.

[62] On May 27, 2021, Age Jr. moved to strike the Clerk's April 2, 2021 letter and Professor Solanky's expert report. R. Doc. 527.  He argued that the Clerk's response went beyond providing factual information by including legal analysis and partisan argument and that the Court should not consider it unless specifically relied upon by the parties. R. Doc. 527-1. Age Jr. was particularly concerned with the information not being in the record. *Id.* As was the Court's intention before receiving Age Jr.'s motion to strike, the Court filed into the record the Clerk's submissions, including the April 2, 2021 letter and Professor Solanky's report, but did not file those portions of the Clerk's submissions consisting of voluminous raw data. R. Doc. 528.  Moreover, in resolving Defendants' motion to quash, the Court has not relied on the hornbook-like legal analysis or so-called "partisan argument" contained in the Clerk's letter, but rather conducted its own legal research and used the factual information provided by Defendants, the Government, and the Clerk to formulate its analysis.  Accordingly, the Court denied Age Jr.'s motion to strike. *Id.* at 2 n.9.

[63] Clerk's April 2, 2021 Letter (R. Doc. 528-5 at 1-13); Solanky Report (R. Doc. 528-5 at 14-71).  Professor Solanky holds a Ph.D. in statistics from the University of Connecticut.  He has been a professor of statistics and mathematics at the University of New Orleans since August 1990 and is currently the chair of the mathematics department.  Professor Solanky has decades of experience teaching and writing about statistics and has published many scholarly articles in the field.  R. Doc. 528-5 at 16.

[64] Clerk's April 2, 2021 Letter at 2-7 (R. Doc. 528-5 at 2-7).

summarizing Professor Solanky's report, which examines the population statistics at each stage of the jury-selection process.[65]

Professor Solanky begins his report by stating the raw population statistics by race for individuals over 18-years-old in the district for the years 2011 through 2018.[66] He found that, on average, African Americans made up 31.08% of the population in these years (ranging from 30.04% in 2011 to 31.65% in 2018), and whites made up 65.28% (ranging from 66.05% in 2011 to 64.61% in 2018).[67] Next, Professor Solanky compares by race the voter registration list with the population reflected in the census data for the years 2013 through 2019.[68] Significantly, he finds that the percentages of African Americans and whites registered to vote are a near-perfect mirror of the over-18 population of these racial groups in the district.[69] Unsurprisingly, then, because the voter registration list is the source of the names for the master jury wheel, Professor Solanky finds that the 2013 master jury wheel, the 2015 supplement, the 2017 master jury wheel, and the 2019 master jury wheel all reflect percentages of African Americans and whites that align with the over-18 population in the district for those years.[70]

Next, Professor Solanky examines the qualified jury wheel.[71] He finds that race percentages among those persons sent juror qualification forms again mirror the racial makeup of the over-18 population in the district, the district's voter registration list, and the master jury wheel. Indeed, for the wheel years 2013, 2015, 2017, and 2019, around 30% of persons receiving questionnaires were African American.[72] Solanky observes, however, that the percentage of white

---

[65] *Id.* at 7-13 (R. Doc. 528-5 at 7-13).
[66] Solanky Report at 5-6 (R. Doc. 528-5 at 19-20).
[67] *Id.* at 6 (R. Doc. 528-5 at 20).
[68] *Id.*
[69] *Id.*
[70] *Id.* at 7-8 (R. Doc. 528-5 at 21-22).
[71] *Id.* at 8-11 (R. Doc. 528-5 at 22-25).
[72] *Id.* at 8-9 (R. Doc. 528-5 at 22-23).

potential jurors who returned the questionnaires was significantly higher than that of African Americans.[73]  Of note, for the 2017 master jury wheel, 53.92% of African Americans who received a questionnaire returned it, while the return rate for whites was 72.90%.[74]  After examining all of this data, Professor Solanky concludes that there is no issue with the Clerk's randomized process of creating the master jury wheel, but that differences in racial composition between the district's over-18 population and jury wheels/pools only occur with the introduction of a non-random element of human activity – namely, the decision to return juror qualification forms – in the creation of the qualified jury wheel.[75]  Professor Solanky opines that other factors (*viz*., undeliverable questionnaires, duplicate records, and deceased individuals) do not and cannot explain the significant number of African Americans who simply do not return their questionnaires.[76]

Professor Solanky concludes that the district's jury-selection process is scientific and objective and "gives a fair and equal opportunity for everyone on the Voter Registration list – a source commensurate with the population at large in the EDLA – to participate in jury selection."[77]  He further concludes that the racial composition of the qualified jury wheel depends on which persons return the juror qualification forms, resulting in a list that "is not expected to mirror the Voter Registration list or the Master Wheel."[78]  Thus, he explains, "[a]ny calculations of statistics and/or disparities based on the assumption that the Qualified Wheels mirror the Voter Registration Lists or the Master Wheels are incorrect."[79]

---

[73] *Id.* at 9 (R. Doc. 528-5 at 23).
[74] *Id.*
[75] *Id.* at 9-11 (R. Doc. 528-5 at 23-25).
[76] *Id*. at 10-11 (R. Doc. 528-5 at 24-25).
[77] *Id.* at 22 (R. Doc. 528-5 at 36).
[78] *Id.*
[79] *Id.*

## II.    LAW & ANALYSIS

### A.  Sixth Amendment Fair-Cross-Section Guarantee

The Sixth Amendment guarantees a criminal defendant the right to a trial by a jury selected at random from a fair cross-section of the community. *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522, 537 (1975)); *see also United States v. Alix*, 86 F.3d 429, 434 (5th Cir. 1996). The fair-cross-section guarantee applies to both grand and petit juries. *Peters v. Kiff*, 407 U.S. 493, 504 (1972); *Murphy v. Johnson*, 205 F.3d 809, 817-18 (5th Cir. 2000). A defendant is not entitled to a grand or petit jury that consists of a particular racial composition, because there is no requirement that the "juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor*, 419 U.S. at 538. "[B]ut the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* Nevertheless, as the Fifth Circuit has recognized, "a jury list drawn objectively, mechanically, and at random from the entire voting list of a [district] is entitled to the presumption that it is drawn from a source which is a fairly representative cross-section of the inhabitants of that jurisdiction. The presumption, of course, is rebuttable but the challenger must carry the burden of showing that the product of such a procedure is, in fact, constitutionally defective." *Thompson v. Sheppard*, 490 F.2d 830, 833 (5th Cir. 1974).

To establish a constitutional defect, namely, a *prima facie* violation of the Sixth Amendment's fair-cross-section requirement, a defendant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).  Intent to discriminate forms no part of the fair-cross-section analysis. *Id*. at 368 n.26.[80]  If the defendant establishes a *prima facie* case, the burden shifts to the government to prove "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process … that result in the disproportionate exclusion of a distinctive group." *Id.*  at 367-68.

### 1.  Distinctive group

The Fifth Circuit has held that African Americans are a distinctive group for the purposes of the Sixth Amendment's fair-cross-section guarantee. *McGinnis v. Johnson*, 181 F.3d 686, 689 (5th Cir. 1999).  Thus, Defendants have unquestionably satisfied the first *Duren* prong.[81]

### 2.  Fairness and reasonableness of representation

The second prong of the *Duren* test focuses on whether the representation of the distinctive group – in this case African Americans – is fair and reasonable in relation to the number of such

---

[80] In contrast, an equal-protection claim for discrimination in the selection of grand or petit juries requires the defendant to show purposeful or intentional discrimination. *Castaneda v. Partida*, 430 U.S. 482 (1977).

[81] In their supplemental motion to quash, Defendants, in something of an afterthought, expand their fair-cross-section challenge to include "persons of lower economic status." R. Doc. 514-1 at 1-2, 18-20, 30. They define this group to include persons in a household with an income of less than $50,000.  R. Doc. 514-2 at 4.  Neither the Administrative Office of the U.S. Courts nor the Clerk collects data on such a group, so the data Defendants put forward was generated by their expert who used 2018 census data reflecting household income by zip code and *race* to place persons in this category.  There are several problems with Defendants' argument and methodology.  First and foremost, no court has recognized "persons of lower economic status" as a distinctive group for the purpose of a fair-cross-section challenge.  *See, e.g., United States v. McDaniels*, 370 F. Supp. 298, 307 (E.D. La. 1973) (Rubin, J.) ("The division of the entire population into 'poor' and 'not poor' persons creates an illusion of a real dividing line where none exists in fact.").  Second, the statistics advanced by Defendants for such a group are not reported on the AO-12s (as are those for race) or any other official report but, instead, are the product of a statistician's assumptions about income based on where people live and their race.  Further, the $50,000 figure is an arbitrary dividing point untethered to anything identifiable or distinctive about the group to set its members apart from those in households earning more than $50,000.  Hence, the numbers do not represent solid data, nor are they based on a logical threshold.  *See* R. Doc. 520-1 at 4 (observation of Government's expert statistician that Defendants' "claim is based on unproven and untested assumptions").  Third, because the statistician used race as one proxy for income, the data is largely a replication of the statistics on racial composition.  This would explain, for example, why, for the qualified jury wheel, the absolute disparity the expert assigns to lower economic status (11.80%, R. Doc. 514-2 at 6) is virtually identical to that for African Americans (11.84%), and why, since this economic group makes up a larger proportion of the district's population (44.06%) than do African Americans (31.1%), the comparative disparity for lower economic status (28.06%) is smaller than for African Americans (38.07%).  *Id.*  Accordingly, even if "lower economic status" was recognized as a distinctive group for the purpose of a fair-cross-section challenge, the Court finds it unnecessary to repeat its analysis of the qualified jury wheel because the relevant statistics for this group are about the same as those for African Americans, and these statistics are analyzed at length below.

persons in the community.  *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001).  The

relevant community is the individuals who are eligible to serve as jurors in this district.  *Id.*; *see

also United States v. Garcia*, 121 F.3d 704, 1997 WL 450169, at *3 (5th Cir. July 15, 1997) ("The

distinctive group consists of the pool of individuals in that division who are eligible to serve as

jurors and not the group's total population."); *United States v. Yanez*, 136 F.3d 1329, 1998 WL

44544, at *1 (5th Cir. Jan. 26, 1998) (stating that the jury-eligible population in the relevant district

is the proper community to examine, not the gross voting-age population).  The jury-eligible

population consists of all persons in the district, except those who (1) are not United States citizens

18 years and older who have resided in the district for at least one year; (2) are not sufficiently

proficient in writing, reading, and understanding English so as to be able to complete the juror

qualification form; (3) are unable to speak English; (4) are incapable of rendering satisfactory jury

service because of mental or physical infirmity; or (5) have a charge pending against them for the

commission, or have been convicted in federal or state court, of a crime punishable by

imprisonment for more than one year and have not had their civil rights restored.  28 U.S.C. §

1865(b).  No party has distilled the jury-service-eligible population of African Americans in the

Eastern District of Louisiana, but they rely instead upon the population figure for blacks 18 years

and older reflected in the census data.  The Court has no choice but to accept this figure as a

reasonable proxy for the jury-eligible population.

### a. The master jury wheel

The master jury wheel was generated by random selection from the designated source list

– namely, the voter registration rolls for the thirteen parishes within the Eastern District of

Louisiana.  As Defendants observe, "the voter rolls of EDLA are reasonably representative of the

number of black citizens in the population."[82]   Professor Solanky agrees, finding that "[t]he percentage of African Americans is … consistent among … the EDLA population of age 18 years or over, the Voter Registration lists, and the Master Wheels."[83]   Thus, the concerns that have historically plagued some voter registration lists are not present in this case.  There is simply no problem of representativeness with respect to the source list used by the district under the jury plan.[84]   It is no surprise, then, that as to the relevant master jury wheel, which was drawn on November 30, 2016, and filled on December 15, 2016, Defendants' own declaration states: "The race and gender report for *the Master Wheel indicates that it had a racial makeup consistent with that of the district*."[85]   This is significant, revealing as it does that there is no constitutional fair-cross-section or JSSA infirmity either in the source list used by the district (*i.e.,* the voter registration rolls) or in the jury plan's provision for generating and the generation of the relevant master jury wheel.  On this point, there is no dispute, nor could there be.

### b.  The qualified jury wheel

Defendants largely confine their challenge to the qualified jury wheel, observing that the "discrepancy in representation is created in the EDLA at the stage of creation of the qualified list."[86]   In their memoranda, Defendants discuss three means for measuring the alleged underrepresentation of African Americans: (1) absolute disparity, (2) comparative (or relative) disparity; and (3) binomial distribution (or standard deviation).[87]   "Absolute disparity measures

---

[82] R. Doc. 483-1 at 21.

[83] Solanky Report at 8 (R. Doc. 528-5 at 22).

[84] That the Court has since revised its jury plan to supplement the voter rolls with drivers' license and personal identification lists as a single, combined source list for the master jury wheel does not point to any problem with the sufficiency or representativeness of the voter registration lists used as the source list under the previous plan.  It just means the Court has expanded the pool of persons who may be selected for the master wheel to include those who have a driver's license or state ID but are not registered to vote.  There is no indication that the racial composition of the wheel is altered in any appreciable way by the addition, nor would the change be relevant to this case.

[85] R. Doc. 483-2 at 2 (emphasis added).

[86] R. Doc. 483-1 at 12 n.5.

[87] *Id.* at 8-11 & n.2; R. Docs. 514-1 at 10-13 & n.2; 525-1 at 21.

the difference between the proportion of the distinctive groups in the population from which the jurors are drawn and the proportion of the groups on the jury list."[88]  *Yanez*, 136 F.3d 1329, at *2 n.4.  It is calculated by subtracting the percentage of citizens 18 years or older in the distinctive group from the percentage of the distinctive group represented in the relevant jury group – here, according to Defendants, the qualified jury wheel.  "Comparative disparity looks to the percentage by which the probability of serving as a juror is reduced for people in the distinctive group and is calculated by dividing the absolute disparity by the percentage of the group in the overall population and then multiplying by 100%."  *Id.*  It essentially measures the extent or rate of the disproportionate representation.[89]  Binomial distribution or standard deviation calculates the statistical probability that the disparity between a group's jury-eligible population and the group's percentage in, here, the qualified jury wheel is attributable to random chance, rather than systematic failure.[90]  *Castaneda*, 430 U.S. at 496 n.17.  Defendants correctly note that the Supreme Court has not selected one of these measures as the only means of identifying underrepresentation, but instead has cautioned that each method has its own imperfections.[91]  Nevertheless, according to Defendants, each of these measures demonstrates an underrepresentation of African Americans in this district's qualified jury wheel, venires, and grand and petit juries.[92]

In 1980, the Fifth Circuit did adopt absolute disparity as the test for the second *Duren* prong when the distinctive group at issue comprises more than ten percent of the community's

---

[88] Said another way, "[t]he absolute disparity test measures the difference between the cognizable group's percentage in the relevant population against the group's percentage on the jury wheel."  NANCY GERTNER, JUDITH H. MIZNER & JOSHUA DUBIN, THE LAW OF JURIES § 2:11, at 41 (10th ed. 2018).

[89] Comparative disparity "measures whether there is a diminished likelihood that members of an underrepresented group will be called for jury service."  THE LAW OF JURIES § 2:11, at 41.

[90] This approach is sometimes called "statistical decision theory (SDT) and disparity of risk."  *Id.* at 42.  Of these three theories (absolute disparity, comparative disparity, and binomial distribution/SDT), the latter, by whatever name, "has not been widely accepted and has faced significant criticism."  *Id.* § 2:12, at 43.

[91] R. Doc. 483-1 at 8 (citing *Berghuis*, 559 U.S. at 329).

[92] *Id.* at 9; R. Doc. 514-1 at 10.

population.  *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980).  Examining prior Supreme Court and Fifth Circuit precedent, the *Maskeny* court held that an absolute disparity of less than 10% was insufficient to demonstrate underrepresentation.  *Id.* (citing *Swain v. Alabama*, 380 U.S. 202 (1965) (equal protection case holding that underrepresentation by as much as 10% did not show purposeful discrimination based on race); *Thompson*, 490 F.2d at 832-33 (pre-*Duren* decision upholding a jury-selection system that resulted in an 11% absolute disparity of African Americans)).  In declining to focus on either the comparative disparity or standard deviation analysis presented by the defendants, the court in *Maskeny* noted that it has, in the past, referred to these other statistical methods, "but has never found a constitutional violation based on the data produced by [them]."  *Id.*

Since *Maskeny*, the Fifth Circuit has observed on several occasions that an absolute disparity of less than 10% is generally insufficient to demonstrate underrepresentation.  *See, e.g., United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir. 1980) (holding that absolute disparities of less than 10% were insufficient); *United States v. Hawkins*, 661 F.2d 436, 442 (5th Cir. 1981) (absolute disparities for women and African Americans of 1.75% and 5.45%, respectively, fell "well within the limits set forth by the Supreme Court and in this Circuit"); *Yanez*, 136 F.3d 1329, at *2 ("absolute disparity of 2.15% for African-Americans and 9.62% for Hispanics in the grand jury panel, and an absolute disparity of 6.15% for African-Americans and 5.63% for Hispanics on the petit jury panel" insufficient to satisfy the second prong of the *Duren* test).[93]  The Fifth Circuit has also reiterated that absolute disparity is the proper statistical measure of representation when

---

[93] Shortly after *Maskeny*, the Fifth Circuit *en banc* held that absolute disparities in excess of 10% (arguably, as high as 11.5%) did not make a *prima facie* showing of underrepresentation in a discrimination case.  *See United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1126-27 (5th Cir. 1981).  And, even before *Duren*, the Fifth Circuit in *Thompson* held that an absolute disparity of 11% was insufficient for a claim of racial discrimination.  *Thompson*, 490 F.2d at 832-33.

the distinctive group at issue exceeds ten percent of the relevant population. *United States v. Butler*, 615 F.2d 685, 686 (5th Cir. 1980) (denying petitions for rehearing and rehearing *en banc*, but noting that consideration of statistical methods other than absolute disparity are unnecessary when small absolute disparities are proved and "a 'less-than-10% minority' was not at issue"); *Yanez*, 136 F.3d 1329, at *2 (restating that absolute disparity was the proper measure and rejecting defendant's argument for comparative disparity).

In 1997, the Fifth Circuit was again asked to measure the underrepresentation in juries of a distinctive group – in that case Hispanics – by using either comparative disparity or disparity-of-risk models. *Garcia*, 121 F.3d 704, at *2-4. The percentage of Hispanics in the jury-eligible community exceeded 10%, and there was a 4.8% absolute disparity in their representation. *Id.* In addressing the applicability of other statistical methods, the court noted that it did "not agree with [the appellant's] argument that the comparative disparity model provides a more accurate assessment of underrepresentation than does the absolute disparity model," because "'the smaller the group is, the more the comparative disparity figure distorts the proportional representation.'" *Id.* at *4 n.10 (quoting *United States v. Hafen*, 726 F.2d 21, 24 (1st Cir. 1984)). The Fifth Circuit in *Garcia* went on to say that "most courts have rejected requests by litigants to abandon the absolute disparity model in favor of one of the alternative disparity models," and even if this particular panel found the other statistical methods "to be superior to the absolute disparity model, we would nevertheless be precluded from adopting either of these alternative models today, as we are bound by *Maskeny* and *Butler* absent a Supreme Court decision or an *en banc* decision by this Court indicating otherwise." *Id.*

More recently, the Fifth Circuit has continued to apply the absolute disparity method but has expanded slightly the upper limit of acceptable disparities. In *United States v. Quiroz*, 137 F.

App'x 667, 670 (5th Cir. 2005), the court found that an absolute disparity of 11.22% as to Hispanics did not satisfy the second prong of the *Duren* test because defendants could not demonstrate that this disparity was "more statistically significant than the 11% disparity which [the Fifth Circuit] found insufficient to sustain a claim of racial discrimination in *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974)." Notably, the comparative disparity in *Quiroz* was 39.76% (that is, the absolute disparity of 11.22% divided by the 28.22% proportion of the distinctive group in the population). *See United States v. Rios Balderrama*, 2004 WL 2595940, at *6 (W.D. Tex. Nov. 12, 2004), *aff'd sub nom. Quiroz*, 137 F. App'x at 670.[94] Hence, the Fifth Circuit in *Quiroz* held that the defendants failed to make out a *prima facie* showing that the jury venire violated the fair-cross-section requirement of the Sixth Amendment and the JSSA. 137 F. App'x at 670; *see also United States v. Sanders*, 2014 WL 2600340, at *4, *6 (W.D. La. June 9, 2014) (absolute disparity of 10.81% was not a Sixth Amendment or JSSA violation).[95]

Defendants' argument that an 11.84% absolute disparity is intolerable falls flat in the face of this Fifth Circuit precedent.[96] The Fifth Circuit in *Thompson* accepted an 11% absolute disparity, and in *Quiroz*, an 11.22% absolute disparity. The 11.84% figure at issue here is not

---

[94] By comparison, the comparative disparity in *Thompson* was 36.49% (that is, the absolute disparity of 11% divided by the 30.23% proportion of the distinctive group in the population). 490 F.2d at 831-32.

[95] Even more recently, in *Woodfox v. Cain*, 772 F.3d 358 (5th Cir. 2014), albeit a discrimination case rather than a Sixth Amendment fair-cross-section challenge, the Fifth Circuit observed that "the Supreme Court has specifically allowed the following disparities to make out a *prima facie* case of grand jury discrimination: 14.7%; 18%; 19.7%; 23%." *Id.* at 375 (footnotes and citations omitted). *See also Mosley v. Dretke*, 370 F.3d 467, 479 (5th Cir. 2004) (recognizing absolute disparity as low as 13.5% as sufficient to make a *prima facie* showing in a discrimination case). The 11.84% absolute disparity the Defendants say is at issue in this case falls below these figures.

[96] Notably, while the caselaw teaches that defendants are not guaranteed a representative cross-section in a particular jury pool, the actual jury panel from which the Defendants' grand jury was selected "included 67 prospective jurors, 16 of whom were black." R. Doc. 483-2 at 12. Thus, African Americans constituted 23.8% of this pool, *see* R. Doc. 514-2 at 4 (23.88%), which, again using the 31.1% figure for the group's proportion of the 18-and-over population of the district, would yield an absolute disparity of 7.3% for the panel. *E.g., Sanders*, 2014 WL 2600340, at *7 (a 5.91% disparity of defendant's particular grand jury meant that he "cannot even show that the alleged underrepresentation of African Americans had a substantial impact on his *own* grand jury") (emphasis in original).

more statistically significant than either the disparity of 11% in *Thompson* or 11.22% in *Quiroz*.[97]

And, while the Fifth Circuit typically steers clear of comparative disparity as a standard measure

of underrepresentation, the statistical insignificance of the differences in these absolute disparities

is reinforced by the fact that the comparative disparity in this case (38.1%) lies in the middle

between those of *Thompson* (36.49%) and *Quiroz* (39.76%), where no fair-cross-section violations

were found.  Moreover, the 31.1% population number used by Defendants is based on the number

of African-American citizens over 18 years of age, not the jury-eligible population, which is the

appropriate measure.  Thus, the 31.1% figure is skewed higher than the relevant jury-eligible figure

because it does not account for persons who would be excluded from jury service.  If this

percentage were adjusted downward by however much, the absolute disparity would decrease by

the same amount, bringing it further in line with the disparities the Fifth Circuit has deemed

acceptable.

Therefore, Defendants have not demonstrated a statistically significant level of

underrepresentation of African Americans on the qualified jury wheel as to satisfy the second

prong of *Duren*.

### 3.  Systematic exclusion

As to the third *Duren* prong, the Supreme Court explained that a jury-selection process

systematically excludes jury-eligible members of a distinctive group if the underrepresentation of

---

[97] This conclusion seems especially apt where the snapshot of the qualified jury wheel upon which Defendants rely (*viz.*, the March 31, 2017 sample of the 8,000 qualification forms then mailed) yields the lowest percentage of African Americans on the qualified wheel (19.26%) as compared to the 19.30% figure resulting from the May 26, 2017 sample of the 16,000 forms mailed by that date to prospective jurors after an additional 8,000 names were randomly drawn from the same master jury wheel, and the 20.21% figure resulting from the March 21, 2019 sample of the then total of 48,000 forms mailed by that date after random selection of an additional 32,000 names from the same master jury wheel.  If one were to use this last figure (which is arguably more representative of the qualified jury wheel since it comprises a larger sample), the absolute disparity for African Americans would be 10.89% (20.21% subtracted from the 31.10% population figure), which is nearly a full percentage point below the disparity advanced by Defendants (11.84%) and lower than the 11% deemed acceptable by the Fifth Circuit in *Thompson*.

that group is "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366. For example, in *Taylor*, the underrepresentation and systematic exclusion resulted from a statutory provision requiring that women officially register their willingness to serve on a jury before being allowed to do so.  419 U.S. at 538.  In *Duren*, the underrepresentation and systematic exclusion were caused by a state law that allowed women to request an automatic exemption from jury service.  439 U.S. at 367.[98]  Demonstrating systematic exclusion requires a showing – independent from the statistics supporting the second prong – that the statistical discrepancy is indeed systematic.  *Paredes v. Quarterman*, 574 F.3d 281, 290 (5th Cir. 2009).  Otherwise, "[i]f any discrepancy sufficient to satisfy the second prong would also satisfy the third, the third inquiry would be superfluous."  *Id.*  In other words, the second prong focuses on the strength of the evidence, while the third prong considers the nature of the selection process and the length of time of any underrepresentation.  *United States v. Weaver*, 267 F.3d 231, 241 (3d Cir. 2001).

When there is no readily apparent exclusionary process, as there was in *Duren*, a defendant may establish systematic exclusion by showing "'a large discrepancy over time such that the system must be said to bring about the underrepresentation.'"  *United States v. Savage*, 970 F.3d 217, 259 (3d Cir. 2020) (quoting *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 269 (3d Cir. 2019)); *see also Weaver*, 267 F.3d at 244.  Courts "evaluate evidence of 'the nature of the system, length of time studied, and efforts at reform to increase the representativeness of jury lists.'"  *Savage*, 970 F.3d at 259 (quoting *Howell*, 939 F.3d at 269).  It follows, then, that a single

---

[98] Defendants' efforts to draw a parallel between this case and *Duren* fall short.  They contend that the Court in *Duren* found systematic exclusion even though "there was no exclusion or barrier to service for women … [s]o, women were never excluded by the jury selection process, it was a decision of the women not to serve."  R. Doc. 525 at 4; *see also* R. Doc. 514-1 at 37.  Defendants conclude, then, that *Duren*'s holding that the jury-selection process at issue there was unconstitutional should extend to the process at issue here in that, as with the women in *Duren*, it is the individual choice of citizens not to serve, not an overt exclusion, that results in the alleged underrepresentation. Of course, this is only half the story: in *Duren*, the statutory opt-out of jury service was provided only to women.  No corollary exists in the case at bar.  In other words, the decision to refrain from returning a completed juror qualification form is not a creature of statute extended only to a distinctive group.  In fact, the law provides the option to no one.

instance of a disproportionate jury venire does not establish systematic exclusion. *Timmel v. Phillips*, 799 F.2d 1083, 1087 (5th Cir. 1986).

A facially neutral selection process is unlikely to demonstrate systematic exclusion. *Howell*, 939 F.3d at 269. Systematic exclusion is not present when the underrepresentation is due to external forces, such as self-exclusion, demographic changes, or undeliverable or unreturned juror questionnaires. *See United States v. Rioux*, 97 F.3d 648, 658-59 (2d Cir. 1996) ("The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes."); *Weaver*, 267 F.3d at 277 (holding there is no systematic exclusion if the underrepresented group has freely excluded itself from jury service and there is no showing that anything in the system has discouraged or prevented the group from participating); *see also United States v. Gometz*, 730 F.2d 475, 480 (7th Cir. 1984) (observing that the district court need not ensure that prospective jurors respond to the summons); *United States v. Jefferson*, 2011 WL 161937, at *3 (E.D. La. Jan. 14, 2011) (holding that courts need not implement procedures to locate prospective jurors whose questionnaires have not been returned or have been returned by the post office as undeliverable); *United States v. O'Reilly*, 2008 WL 4960173, at *5 (E.D. Mich. Nov. 20, 2008) (observing that failure of clerk's office to stringently follow up on unreturned questionnaires is not systematic exclusion as would satisfy third prong of *Duren* test).[99] Thus, even if a particular group registers and votes in lower numbers than the rest of the population, this "alone does not make the jury selection process illegal absent proof that

---

[99] Unreturned juror questionnaires and self-exclusion are the external forces most relevant to this case but other examples include: a global pandemic, *see United States v. Jones*, 2020 WL 6720998, at *1-2 (S.D. Miss. Nov. 16, 2020); bad weather, *see United States v. Little Bear*, 583 F.2d 411, 414-15 (8th Cir. 1978); *State v. McDonald*, 387 So. 2d 1116, 1123 (La. 1980); and demographic changes resulting from natural disasters, *see Jefferson*, 2011 WL 161937, at *3 (collecting cases); *United States v. Haynes*, 2006 WL 1236059, at *3 (E.D. La. May 3, 2006); *United State v. Dixon*, 2006 WL 278258, at *5-6 (E.D. La. Feb. 3, 2006).

obstacles were placed in the path of members of the minorities attempting to register to vote or to vote." *Yanez*, 136 F.3d 1329, at *2.

Courts have reasoned that the external force of unreturned juror qualification forms cannot result in systematic exclusion because the failure to respond – and any attendant underrepresentation of a distinctive group – is "the result of individual choice," and not a problem inherent in the particular jury-selection process utilized. *Bates v. United States*, 473 F. App'x 446, 451 (6th Cir. 2012); *see also United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*."); *United States v. Cecil*, 836 F.2d 1431, 1447 (4th Cir. 1988) (noting that disparities attributable to "personal predilection" cannot form the basis of a fair-cross-section claim); *United States v. Burgess*, 2015 WL 13674173, at *4 (E.D. Wash. Feb. 19, 2015) (holding that underrepresentation due to lower response rate was not due to jury-selection system itself); *United States v. Murphy*, 1996 WL 341444, at *5 (N.D. Ill. June 18, 1996) ("The jury selection system … is not excluding African-Americans as a group, but many African-American individuals are excluding themselves by not responding to jury questionnaires."); *United States v. Ortiz*, 897 F. Supp. 199, 205 (E.D. Pa. 1995) (holding there is no systematic exclusion where "it was the unfortunate failure of Hispanics either to register to vote or to return jury questionnaires, through no fault or encouragement of the court's jury selection procedures, which may have produced any underrepresentation of Hispanics on grand juries"). Once on the master jury wheel, all a citizen need do to cause his or her name to be considered for the qualified jury wheel is to return a completed juror qualification form – an action required by law. This is not unfair.[100]

---

[100] In enacting the JSSA, Congress arrived at the same conclusion with respect to the use of voter rolls as the source list for jury service. S. Rep. No. 891, 90th Cong., 1st Sess. 17 (1967) ("In a sense the use of voter lists as the

This district's jury-selection process is facially neutral.  There is no evidence of a statute or other identifiable rule or selection procedure that specifically excludes African Americans or places obstacles in their path to jury service.  Indeed, during the relevant period, the Clerk randomly drew the names of prospective jurors from a voter registration list of all parishes in the district.  There is no evidence of any impropriety in the random-selection process.[101]  Instead, the crux of Defendants' argument for systematic exclusion is that an absolute disparity of 11.84% cannot be the result of random chance – especially when approximately replicated through 136 jury pools over a seven-and-a-half-year period.  But Defendants' argument that this discrepancy alone proves an inherent problem with the jury-selection process fails to account for the possibility that external forces – principally, the failure to return questionnaires – could cause the underrepresentation.  Professor Solanky found that for the 2017 wheel and the 2019 supplement of that wheel, respectively, 53.92% and 52.40% of African Americans returned completed juror qualification forms as compared to 74.71% and 72.90% of whites.[102]  Given these rates of return, a random selection of jurors placed on the qualified jury wheel cannot be expected to yield the same percentages of racial composition as reflected in the master jury wheel, voter registration lists, and general population in the district.  As the statistical expert explains:

> Since the category of "Returned Questionnaires" is based on the questionnaires that were returned from potential jurors, from a statistical perspective, it is *not* expected

---

basic source of juror names discriminates against those who have the requisite qualifications for jury service but who do not register to vote.  This is not unfair, however, because anyone with minimal qualifications – qualifications relevant to jury service – can cause his name to be placed on the lists simply by registering or voting."); H.R. Rep. No. 1076, 90th Cong., 2d Sess. 5 (1968) (same).  The practical result is that in order to be considered for jury service a citizen "must be sufficiently concerned with the operation of his [or her] government either to register to vote or actually to vote," Gewin, *The Jury Selection and Service Act of 1968: Implementation in the Fifth Circuit Court of Appeals*, 20 MERCER L. REV. 349, 358 (1969), and to return a completed juror qualification form.

[101] Defendants argue that "facial 'impartiality' is not enough," and that requiring a showing of "a non-neutral exclusionary criteria" to satisfy *Duren*'s third prong of systematic exclusion improperly incorporates an intentional discrimination test.  R. Doc. 525 at 9-10.  The argument is specious.  *Duren* itself involved a statutory provision that was non-neutral (applying only to women) and exclusionary (permitting an opt-out of jury service) that led the Supreme Court to find systematic exclusion, without requiring the finding of intentional discrimination it had previously required for equal-protection challenges.  *See Castaneda*, 430 U.S. at 494-95.

[102] Solanky Report at 9 (R. Doc. 528-5 at 23).

to be a random sample of the Voter Registration list or of the Master Wheel.  More specifically, the collection of "Returned Questionnaires," once they are received by the recipients, are subject to human decisions and are no longer part of the randomized process utilized by the Clerk's Office.  As a result, the "Returned Questionnaires" category is not expected to be random.[103]

From this, Professor Solanky concludes:

The "Qualified Jury Wheel" and the category of people who return questionnaires is based on the qualification process … which, in turn, depends on the rate of returned juror questionnaires.  Because it is based on external factors – *i.e.* whether potential jurors return the questionnaires received – it is not expected to mirror the Voter Registration list or the Master Wheel.  Any calculations of statistics and/or disparities based on the assumption that the Qualified Wheels mirror the Voter Registration Lists of the Master Wheels is incorrect.[104]

To be sure, the random selection of jurors from the qualified jury wheel built from the juror qualification forms that were returned resulted in jury pools during the relevant time period having approximately the same percentage of African-American representation (20.8%) as on the qualified wheel itself (around 20%), just as one would expect from a statistical perspective.[105]  It is statistical fancy for Defendants to expect that the racial composition of the master jury wheel would be replicated in the 136 jury pools selected at random from the qualified jury wheel given the intervening and determinative external forces involving individual choice.  Thus, Defendants' application of binomial distribution or standard deviation theory to analyze the jury pools or the qualified jury wheel simply does not work.  *See Rioux*, 97 F.3d at 655 ("It is illogical to apply a theory based on random selection when assessing the constitutionality of a qualified wheel.  By definition, the qualified wheel is not the product of random selection; it entails reasoned disqualifications based on numerous factors.  It is irrational to gauge the qualified wheel – an

---

[103] *Id*. at 10 (R. Doc. 528-5 at 24) (emphasis in original).
[104] *Id*. at 22 (R. Doc. 528-5 at 36).
[105] *Id*. at 18-19 (R. Doc. 528-5 at 32-33).

inherently non-random sample [as compared to the master wheel] – by its potential for randomness.").[106]

Defendants acknowledge the significance of the issue of unreturned juror qualification forms but blame the Clerk for failing to issue summonses to all prospective jurors who have not returned a form.[107]  In doing so, Defendants first discount the Clerk's practice of remailing forms to all nonrespondents.[108]  Defendants then fail to account for the daunting financial and public-relations costs that would accompany their proposed solution of serving a summons to conscript into jury service each prospective juror who did not complete and return a form – which if, say, 60,000 forms were initially sent would require delivery of summonses to 26,400 (44% of 60,000) persons.  These steps are not constitutionally required.  *See Gometz*, 730 F.2d at 480 (observing that considerations of the costs and burdens of issuing "thousands of summonses every year to persons who do not return juror qualification forms, and then to follow up on all the summonses that are ignored … increase our reluctance to infer from the [JSSA] provision empowering court clerks to follow up on nonresponders a legislative intent that the power must be used to eliminate possible nonresponse bias"); *Jefferson*, 2011 WL 161937, at *3; *O'Reilly*, 2008 WL 4960173, at *5.  And they are fraught with potential problems, both foreseeable and unforeseeable.  Finally, Defendants' expert suggests that the Clerk should remedy the nonresponse problem by replacing an unreturned juror qualification form "with another qualification questionnaire from the same Zip code."[109]  This suggestion has at least two deficiencies.  First, the procedure is not specified in the district's jury plan so, as a deviation from the plan, would constitute a JSSA violation on its own.

---

[106] As Defendants themselves are forced to conclude: "Random selection from a non-random sample does not produce a random sample."  R. Doc. 525 at 23.

[107] R. Doc. 514-1 at 16, 35-37.  The Court agrees with the Government's observation that, in trying "to shift the burden to the Clerk to remedy the high rate of non-returns," the Defendants seek "to change [without warrant] what courts have considered an 'external' issue into an 'inherent' one."  R. Doc. 520 at 37.

[108] *See supra* note 36.

[109] R. Doc. 514-2 at 13; *see also* R. Doc. 525-1 at 3.

Second, as the First Circuit has held, the suggestion "violates the 'equal odds' requirement of the plan because the supplemental draw, constrained by the preferences for those in certain zip codes, does not give equal odds of selection to every name in the master wheel." *In re United States*, 426 F.3d 1, at *6 (1st Cir. 2005). The goal of randomness is thus undermined by this proposed solution, and, regardless, this Court is without power to order such action.

Therefore, Defendants have not demonstrated that the alleged underrepresentation is due to systematic exclusion of African Americans in the jury-selection process as to satisfy the third prong of *Duren*.[110]

\*     \*     \*     \*     \*

In sum, Defendants have not carried their burden of demonstrating a Sixth Amendment fair-cross-section violation in the jury-selection process utilized to select the grand jury that indicted Defendants.

## B.  JSSA

The JSSA provides that all litigants in federal court entitled to a trial by jury "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division where the court convenes." 28 U.S.C. § 1861. In addition, "all citizens shall have the opportunity to be considered for service on grand and petit juries … and shall have

---

[110] The rest of Defendants' arguments are largely rhetorical. The historical, purposeful, and involuntary exclusion of African Americans from juries prior to enactment of the JSSA in 1968 is unfairly compared to the disparity on the district's qualified jury wheel resulting from the individual choices of its citizens not to return completed juror qualification forms. R. Doc. 514-1 at 24-26. Defendants also muse that no disparities should exist in this age of technology. *Id*. at 28-29. The good news is that they do not on the relevant master jury wheel, which had a racial composition nearly identical to that of the voter-age population in the district. The bad news is that no amount of technological progress can make up for the free-will choices of the district's citizens to refuse to participate in the jury system. Finally, the Defendants' oft-repeated refrain that the Eastern District of Louisiana is "the worst in the country" or "an extreme outlier" is effectively rebutted by the showing made by the Government's expert statistician that the district's relative disparity (which he considers "a more natural measure" as between judicial districts having differing comparative levels of African-American population) places the Eastern District of Louisiana "roughly in the middle of the" pack. R. Doc. 520-1 at 6-7.

an obligation to serve as jurors when summoned for that purpose." *Id*.   A citizen cannot be excluded from jury service "on account of race, color, religion, sex, national origin, or economic status." *Id.* § 1862.   The JSSA requires each district court to "devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862." *Id.* § 1863(a).

A defendant may challenge the selection of the grand or petit jury by moving to dismiss the indictment or to stay the proceedings on the ground that the jury was not selected in compliance with the JSSA.   *Id.* § 1867(a).   To succeed on a JSSA challenge, a defendant must show "a 'substantial failure' to comply with the Act's provisions, a substantial failure being one that destroys the random nature or objectivity of the selection process." *United States v. Olaniyi-Oke*, 199 F.3d 767, 772 (5th Cir. 1999); *see also* 28 U.S.C. § 1867(a).   In analyzing this question, a court must weigh the alleged violation of the JSSA against the statute's underlying principles: (1) the random selection of jurors from the district's voter lists; and (2) the determination of juror disqualifications, excuses, exemptions, and exclusions based solely on objective criteria. *United States v. Bearden*, 659 F.2d 590, 600-01 (5th Cir. 1981).   A substantial violation occurs "only when these principles are frustrated." *Id.* at 601.   Technical violations, even a number of them, are insufficient. *Id.*

Voter registration lists are recognized as the primary source for obtaining a random selection of jurors, where disqualifications, excuses, exemptions, and exclusions are objectively determined. *Maskeny*, 609 F.2d at 192.   Thus, using voter registration lists as the sole source for potential jurors "is constitutionally permissible unless this system results in the systematic exclusion of a 'cognizable group or class of qualified citizens.'" *Id.* (quoting *Camp v. United States*, 413 F.2d 419, 421 (5th Cir. 1969)); *see also United States v. Reyes,* 252 F. App'x 659, 662

(5th Cir. 2007) (clerk's failure to supplement voter registration list with driver's license list does not violate JSSA).  Indeed, the qualifications for voting and serving on juries are substantially similar.  *Garcia*, 121 F.3d 704, at *5.  Moreover, "the failure of an identifiable group to register and vote does not render invalid the selection of jurors from a voter registration list."  *United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981).

To establish a *prima facie* case of a JSSA violation, the defendant must demonstrate the same three factors required to prove a Sixth Amendment fair-cross-section violation: (1) that a "distinctive" group in the community is alleged to have been excluded; (2) that the representation of the group in jury venires is not fair and reasonable in relation to the group's numbers in the community; and (3) that the underrepresentation is caused by systematic exclusion of the group in the jury-selection process.  *Duren*, 439 U.S. at 364; *Williams*, 264 F.3d at 568.  To succeed on a JSSA challenge to a grand jury selection, a defendant must demonstrate "the impact of an absolute disparity on the jury list."  *Maskeny*, 609 F.2d at 191 (citing *United States v. Goff*, 509 F.2d 825 (5th Cir. 1975)).  If a defendant establishes a *prima facie* case of a JSSA violation in selecting the grand jury, the court must "stay the proceedings pending the selection of a grand jury in conformity with [the JSSA] or dismiss the indictment, whichever is appropriate."  28 U.S.C. § 1867(d). Further, if a *prima facie* violation is shown, conformity requires that the voter list be supplemented with some other source of names.  *Brummitt*, 665 F.3d at 530 (quoting 28 U.S.C. § 1863(b)(2)).

Defendants' JSSA claim fares no better than their Sixth Amendment fair-cross-section claim.  They assert that there must be a JSSA violation because of the same statistical disparities advanced as the basis for their fair-cross-section claim.  A statistical discrepancy alone does not prove a JSSA violation when voter rolls constitute the source list for jury selection.  And, again, Defendants admit that the master jury wheel, which is derived from the district's voter rolls, "had

a racial makeup consistent with that of the district"[111] – which was also confirmed by Professor Solanky.  Therefore, there is no need to supplement the voter registration rolls to achieve the statutory goal of juries selected at random from a fair cross-section of the community.  Further, there is absolutely no evidence that there have been any improprieties in the selection process or that jurors have been selected in a non-random manner.  Thus, Defendants have not satisfied their burden of proving a *prima facie* case of a JSSA violation.[112]

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' motion to quash the indictment and stay the proceedings (R. Doc. 483) is DENIED.

---

[111] R. Doc. 483-2 at 2.

[112] In their supplemental motion to quash, Defendants add three other arguments not appearing in their original motion.  First, they argue that the JSSA is violated in that Jefferson Parish is overrepresented in the master jury wheel.  R. Docs. 514-1 at 30-33; 514-2 at 9-10.  Yet, in expounding on this argument, Defendants' expert makes plain that the process used by the Clerk to create the master jury wheel was the process established in the jury plan and was itself based on principles of objectivity and randomness – "choosing the first person at a randomly determined starting number and then selecting persons at a constant interval," R. Doc. 514-2 at 10 – and therefore compliant with the JSSA.  The expert explains that Jefferson Parish is supposedly overrepresented in the resulting selection because the "randomly determined starting number" fell within the list of Jefferson Parish voters.  Obviously, the starting number could just as easily have fallen within the list of Orleans Parish voters but, by random chance, it did not.  This does not amount to a JSSA violation.

Second, Defendants contend that the failure to prescribe a source list other than the list of registered voters constitutes a substantial failure to comply with the JSSA.  R. Doc. 514-1 at 33-35.  This argument fails for the simple reason that such lists are universally approved as source lists, *see, e.g., Yanez*, 136 F. 3d 1329, at *2, and Defendants have not shown that the source list of registered voters resulted in any racial disparity on the master jury wheel.  That the district has since expanded its source lists to include a list of persons with driver's license and personal identification numbers only means that additional citizens will have the opportunity to serve as jurors, with no indication that such inclusion will have any effect on the racial composition of the master jury wheel (where the only room for improvement for the relevant wheel was between 30.59% and 31.10%, *see supra* note 34 and accompanying text).

Third, Defendants speculate that 45,936 voters were excluded from the source list from which the relevant master jury wheel was drawn because this was the difference in the number of names on that list and the November 2016 voter registration list posted online in the Louisiana Secretary of State's historical summaries.  R. Doc. 514-2 at 9.  But Defendants do not contradict the Clerk's representation that she constructed the master jury wheel using the voter registration list supplied by the state agency.  In other words, whatever the explanation for the difference (including, for example, that the lists were generated on different dates, contained duplicates, etc.), it was not the result of the district's jury plan or any action by the Clerk to exclude any listed voter from being considered for jury service.  *See Garcia*, 121 F.3d 704, at *6 (holding that defendants failed to show substantial noncompliance given the absence of evidence "that the jury list is selected in a nonrandom manner or that there has been any finagling at any stage of the selection process").

Notwithstanding this disposition of Defendants' motion, which is dictated by governing law, the Court recognizes that the district desires that the representation of African Americans on the qualified jury wheel and in its jury pools and panels more closely approximate the group's population percentage in the community.  Toward that end, the district could examine the plans and procedures of federal courts around the country to identify best practices for encouraging and maximizing the return, and rates of return, of completed juror qualification forms, especially among African Americans.  The Court is aware that the district has already begun to take some of these steps.  Doing so will enhance and advance the district's goal of selecting juries from a fair cross-section of its community.  As the Supreme Court has recently observed:

> The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power.  The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases.  Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law.  The jury is a tangible implementation of the principle that the law comes from the people.

*Pena-Rodriguez v. Colorado*, 580 U.S. ___, 137 S. Ct. 855, 860 (2017).  No doubt the judgments handed down by juries will find even greater acceptance in the community and inculcate even greater respect for the rule of law as they are rendered by juries more and more reflective of the community from which they are drawn.

New Orleans, Louisiana, this 2nd day of June, 2021.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

33