UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                       NO. 16-32

LOUIS AGE JR., *et al.*                       SECTION M (1)

### ORDER & REASONS

Before the Court is a motion *in limine* by the United States of America (the "Government")

to admit statements of Milton Womack pursuant to Rule 804(b)(6) of the Federal Rules of

Evidence.[1]  Defendants Louis Age Jr., Louis Age III, Ronald Wilson, Jr., and Stanton Guillory

(collectively, "Defendants") respond in opposition,[2] and both sides reply in further support of their

respective positions.[3]  On March 28, 2022, the Court held an evidentiary hearing concerning the

motion at which it received testimony from Special Agent William C. Williams of the Federal

Bureau of Investigation.  Having considered the parties' memoranda, the record, the evidence

presented at the March 28, 2022 hearing, and the applicable law, the Court issues this Order &

Reasons granting the government's motion *in limine* to admit Womack's statements pursuant to

Rule 804(b)(6).

I.      **BACKGROUND**

On August 17, 2017, the grand jury in the United States District Court for the Eastern

District of Louisiana returned a superseding indictment in this case charging Defendants with

---

[1] R. Doc. 516.
[2] R. Doc. 531.
[3] R. Docs. 542; 762.

various counts arising from the July 27, 2012 murder of Milton Womack.[4]  Womack was a co-defendant in a Medicare fraud case filed in the United States District Court for the Middle District of Louisiana, and styled *United States v. Louis Age, Jr. et al.*, Criminal Action No. 11-105. Womack was murdered two days after documents were filed in that case indicating that he was changing his plea to guilty.  The Government's theory of this case is that Defendants herein conspired to murder Womack in retaliation for his past cooperation with law enforcement, to prevent him from testifying at the Medicare fraud trial, and to prevent him from otherwise cooperating with law enforcement.

## II.     PENDING MOTION

The government seeks to introduce into evidence at trial statements Womack made to other individuals pertaining to his knowledge of the Age family's prior criminal activities and his fear of Age Jr. and his associates.[5]  The statements include, but are not limited to, Womack's participation in an insurance fraud scheme involving arson, as well as in the healthcare fraud scheme; Womack's relationship with Age Jr.'s "company" lawyer, who represented Womack in the healthcare fraud case; Womack's representation by a court-appointed lawyer in the healthcare

---

[4] R. Doc. 542.  Count 1 charges Defendants with conspiring to commit murder for hire, in violation of 18 U.S.C. § 1958.  Count 2 charges Defendants with using a facility of interstate commerce (a cell phone) to commit murder for hire, in violation of 18 U.S.C. §§ 1958 and 2.  In Count 3, Defendants are charged with conspiring to murder Womack to prevent him from testifying in the Medicare fraud case, in violation of 18 U.S.C. §§ 1512(a)(3)(A) and 1512(k).  Count 4 charges Defendants with killing Womack to prevent him from testifying in the Medicare fraud case, in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(3)(A), and 2.  Count 5 charges Age Jr. and Age III with killing Womack to prevent him from communicating with law enforcement about his knowledge of the Medicare fraud scheme, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(3)(A), and 2.  In Count 6, Defendants are charged with conspiring to murder Womack in retaliation for his cooperation with law enforcement, in violation of 18 U.S.C. §§ 1513(a)(2)(A) and 1513(f).  Count 7 charges Defendants with killing Womack in retaliation for his cooperation with law enforcement, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(A), and 2.  Count 8 charges Age Jr. and Age III with conspiring to use intimidation, threats, and corrupt persuasion to influence, delay, or prevent testimony in the Medicare fraud case and hindering, delaying, and preventing further communication with law enforcement relating to the commission or possible commission of a federal offense (healthcare fraud), all in violation of 18 U.S.C. § 1512(k).  In Count 9, Age Jr. and Age III are charged with conspiring to retaliate against a witness for aiding law enforcement in the Medicare fraud case, in violation of 18 U.S.C. § 1513(f).  In Count 11, Age III is charged with making false statements to FBI agents in violation of 18 U.S.C. § 1001.  *Id.* at 2-11.
[5] R. Doc. 516

fraud case; and Womack's fear of retaliation for his cooperation with law enforcement.[6]   The

Government argues that Womack's statements are admissible under Rule 804(b)(6) of the Federal

Rules of Evidence because Defendants procured his unavailability as a witness by murdering him.[7]

In this vein, the Government argues that all of Womack's statements are admissible, not just those

pertaining to the healthcare fraud and other past criminal activity of Defendants, because

Defendants procured his unavailability to silence him as a witness in all respects – including as to

his fear of harm from, and intimidation by, Defendants.[8]  Moreover, the Government contends that

agency and conspiracy principles apply to make Womack's statements admissible against all

Defendants.[9]  Finally, the Government points out that other arguments concerning admissibility

can be handled through contemporaneous objections – and rulings – as the statements are

introduced at trial.[10]

In opposition, Defendants advocate for the application of a clear-and-convincing

evidentiary standard to the analysis because, they say, their objection to the introduction of

Womack's statements is rooted in the Confrontation Clause, not Rule 804(b)(6).[11]  They also argue

that, if the Government meets its burden of proof, only the statements Defendants allegedly sought

to prevent Womack from making can be admitted – namely, those statements concerning

Womack's purported knowledge of the Age family's prior criminal activity, not his fear of

Defendants.[12]  Additionally, Defendants argue that Womack's statements are not admissible

against Guillory because his alleged role in the offense was motivated by money (being a paid hit-

---

[6] R. Doc. 516-1 at 17-20.
[7] *Id.* at 8-17.
[8] R. Doc. 542 at 6-9
[9] *Id.* at 9-12.
[10] *Id.* at 16-17
[11] R. Doc. 531 at 4-8.
[12] *Id.* at 13-14.

man), not a desire to prevent Womack from testifying.[13]  Finally, Defendants argue that the Court must consider other bases for excluding Womack's statements, such as hearsay and Rules 403 (balancing probative value with undue prejudice) and 602 (personal knowledge).[14]

## III.   LAW & ANALYSIS

### A.   Rule 804(b)(6) Standard

The Confrontation Clause, found in the Sixth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." "The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him."  *Giles v. California*, 554 U.S. 353, 358 (2008).  The Confrontation Clause's goal of ensuring that reliability of evidence through cross examination "is a procedural rather than a substantive guarantee."  *Crawford v. Washington*, 541 U.S. 36, 61 (2004) ("It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.").

There are two exceptions to the constitutional guarantee of confrontation.  *Giles*, 554 U.S. at 358.  The first is when declarations are "made by a speaker who was both on the brink of death and aware that he was dying."  *Id.*  The second – the one at issue here – is the doctrine of forfeiture by wrongdoing, which "permit[s] the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant."  *Id.* at 359 (citations omitted).  In

---

[13] *Id.* at 15-16.

[14] *Id.* at 16-19; *see also* R. Doc. 762.  Defendants' arguments regarding the privilege purportedly attaching to Womack's attorney-client communications with his court-appointed attorney are addressed in another order.  *See* R. Doc. 749.

other words, it applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Id.* (emphasis in original).

The forfeiture-by-wrongdoing doctrine is codified in Rule 804(b)(6), which provides that "[a] statement offered against a party that wrongfully caused – or acquiesced in wrongfully causing – the declarant's unavailability as a witness, and did so intending that result" is "not excluded by the rule against hearsay if the declarant is unavailable as a witness."  The party seeking to admit the statement under Rule 804(b)(6) – here, the Government – must demonstrate by a preponderance of the evidence that (1) Defendants were involved in, or responsible for, procuring Womack's unavailability "through knowledge, complicity, planning or in any other way," and (2) Defendants acted with the intent of procuring Womack's unavailability as an actual or potential witness.  *United States v. Dhinsa*, 243 F.3d 635, 653-54 (2d Cir. 2001) (quotation and citation omitted); *see also United States v. Gurrola*, 898 F.3d 524, 534 (5th Cir. 2018).[15]

As to the second prong, the Government is not required to "show that the defendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defendant 'was motivated *in part* by a desire to silence the witness.'"  *Dhinsa*, 243 F.3d at 654 (quoting *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir 1996) (emphasis in original)).  Moreover, a co-conspirator's waiver of confrontation rights can be imputed to other participants in the conspiracy when "the wrongful act at issue was in furtherance and within the scope of an ongoing conspiracy and reasonably foreseeable as a natural or necessary consequence."  *United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-

---

[15] The Fifth Circuit unquestionably applies a preponderance standard when weighing the evidence under Rule 804(b)(6). *Gurrola*, 898 F.3d at 534.  Defendants argue, however, that their objection to the admission of Womack's statements is rooted in the Confrontation Clause, not Rule 804(b)(6), and thus a clear-and-convincing standard applies. R. Doc. 531 at 4-8.  In *United States v. Nelson*, 242 F. App'x 164, 171 n.2 (5th Cir. 2007), the Fifth Circuit commented that the standard of proof "may well be higher" than preponderance of the evidence when the objection to the admission of an unavailable declarant's statements is rooted in the Confrontation Clause, rather than Rule 804(b)(6). This Court need not weigh in on the issue because the Government has met both.

48 (1946)); *United States v. Dinkins*, 691 F.3d 358, 385 (4th Cir. 2012) (accord).  More recently, another court has expressed a lean (but not yet a decision) toward applying agency principles to impute acts of one conspirator, acting as an agent, to other coconspirators.  *See United States v. Brown*, 973 F.3d 667, 700-01 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1253 (2021).

If the declarant's statements are deemed admissible, "Rule 804(b)(6) places no limitation on the subject matter of the declarant's statements that can be offered against the defendant at trial to prove that the defendant murdered the declarant."  *Dhinsa*, 243 F.3d at 653; *see also Gurrola*, 898 F.3d at 534-35 (allowing the admission of statements of the deceased declarant concerning her fear that the defendant would kill her to prevent her from testifying); *United States v. Jordan*, 2021 WL 1030996, at *2 (N.D. Miss. Mar. 17, 2021) (holding that Rule 804(b)(6) permits the admission of statements related to the underlying crime and subsequent shooting of the declarant which rendered him unavailable).  There is no limitation because "[b]y its plain terms, Rule 804(b)(6) refers to the intent of a party to procure the unavailability of the *witness*, and does not … limit the subject matter of the witness' testimony to past events or offenses the witness would have testified about had he been available."  *Dhinsa*, 243 F.3d at 652 (emphasis in original).

## B.    Analysis

Agent Williams, a twenty-year veteran of the FBI, was the case agent in charge of investigating Womack's murder.[16]  He testified at the hearing that Womack was killed on July 27, 2012, around 4:00 p.m.  Womack was inside his minivan, which was parked in front of his girlfriend's house located at 2715 Verbena Street, New Orleans, Louisiana, in the Gentilly neighborhood.  When the first responders (of which Williams was not one) arrived at the scene,

---

[16] A district court may rely on hearsay statements in applying Rule 804(b)(6).  *Gurrola*, 898 F.3d at 534 n.14 ("District courts are not 'bound by evidence rules, except those on privilege' when determining the admissibility of evidence at a pre-trial hearing.") (quoting Fed. R. Evid. 104(a)).

they found Womack shot to death in his minivan with the doors closed.  They also found six shell

casings that ballistics testing revealed were all fired from the same gun.  Womack was in his late

fifties or early sixties and did not have a significant criminal history.  There was no evidence of an

altercation, domestic violence, or that Womack was a gang member, but he may have been a small-

time drug dealer.  There was no evidence of a botched robbery or carjacking.  Based on the

foregoing, Williams concluded that Womack's death was a targeted killing.

A house on the same block of Verbena Street had surveillance cameras that captured

images of a red Monte Carlo driving up and down the street in front of Womack's girlfriend's

house numerous times on July 26, 2012, the day before the murder.  Witnesses saw two or more

teenaged black males in the car.  Williams surmised that the persons in the red Monte Carlo were

hunting Womack.

When Williams was assigned to the case, he interviewed Womack's mother and sister, who

both informed him of the healthcare fraud case pending in Baton Rouge.  Both stated that Womack

told them he was involved in an insurance fraud, and someone asked him to lie.

Williams identified the indictment from the healthcare fraud case, a federal criminal

prosecution, which listed Womack and Age Jr. among the defendants.  Ayanna Age and Verna

Age, Age Jr.'s daughter and wife, respectively, were also named as defendants in that case.  Age

Jr. and Ayanna owned the home healthcare company at issue in that case.  Ayanna asked Womack

to return to Houma, Louisiana, from Atlanta, Georgia (where he was living after Hurricane

Katrina) to work as a recruiter for the company.  A July 25, 2012 docket entry in that case noted

that Womack was to change his plea to guilty on July 30, 2012.  Williams testified that the temporal

proximity of the docket entry and the murder pointed to a connection between the healthcare fraud

case and Womack's murder.

When law enforcement officers tested the bullet casing from the Womack murder scene, they discovered that those casings matched a bullet casing found by the New Orleans Police Department in a maroon (burgundy) Infiniti that was involved in a shootout in the Gentilly neighborhood prior to Womack's murder. This indicated that the casing found in the Infiniti came from the same gun used to murder Womack. Fingerprints found in the Infiniti matched those of Charles "Buddy" Lewis, who was shot three times during the Gentilly shootout. Lewis told Williams that Guillory fired the gun in the Gentilly shootout. Tyrone "T-Man" Harden was also in the car. Guillory, Harden, and Lewis were all members of the Young Mafia Fellas ("YMF") gang.

On August 1, 2012, law enforcement officers connected Guillory to the red Monte Carlo when he crashed it after being chased by the police in a separate incident. Guillory and his passenger, Raheem Jackson, were both caught after they fled on foot. Guillory was detained and Jackson, who was fifteen at the time, was released. While in jail, Guillory called Lewis to discuss raising bail money. During the call, Lewis commented that "Big Lou" (a/k/a Age III) owed Guillory money. Guillory obtained Age III's phone number and called it from the jail numerous times. But Age III had blocked the jail number. Williams testified that this accident involving the red Monte Carlo, along with the Gentilly shootout, pointed to Guillory's connection to the vehicle and weapon used in Womack's murder.

On August 17, 2012, Jackson was arrested at his school with the Womack murder weapon. A day or two after Womack's murder, there was a party at a Motel 6, which was attended by Guillory, Jackson, Brian Marigny, and others. Guillory had the gun with him. The group went to Marigny's mother's house with the gun and Lewis took it from Marigny. Guillory may have come back into possession of the gun and then gave it to Jackson to protect himself from "Chunky," who

had supposedly murdered Terrence "T-Mike" Lewis (another YMF member).   Guillory later commented that he could not believe Jackson got him caught by being arrested with the gun.

Williams interviewed Jackson regarding Womack's murder.   Jackson told Williams that he and Marigny were passengers in the red Monte Carlo, which was driven by Guillory, on July 26 and 27, 2012.  They were hunting Womack on July 26, 2012, when cruising Verbena Street. Jackson said that on July 27, 2012, Guillory shot and killed Womack.  Jackson also said that Age III hired Guillory to kill "the old man" (Womack) because Age III's "people" were on trial, and Womack was going to testify against them.  According to Jackson, Wilson (through his son Ronald "Ronu" Wilson, III) provided the connection between Age III and the young gang members. Jackson saw Wilson and Age III together "all the time" in July 2012.  Guillory never had a cellular telephone, so Jackson allowed Guillory to use his phone to contact Age III.  Phone records show contact between Jackson's phone and Age III's phone from July 21, 2012, to July 25, 2012.

Williams also interviewed Marigny, who said that Age III hired Guillory to perform a murder.  Marigny said that the first meeting between Age III and Guillory occurred in the Iberville housing project during a repast following T-Mike's funeral, and that Wilson provided Age III's connection to the gang.  Marigny stated that the red Monte Carlo was stolen in a carjacking around the time of the repast, and that he and Jackson were in the car with Guillory on July 26 and 27, 2012, when they were hunting, and then Guillory shot, Womack.  Marigny allowed Guillory to use his phone to contact Age III.  Phone records show contact between Marigny's phone and Age III's phone beginning on July 25, 2012, and continuing to July 31, 2012.  There was one call placed from Marigny's phone to Age III's phone within 30 to 40 seconds after the Womack murder. Williams surmised that this call was the gunman (Guillory) informing Age III that the hit had been completed and looking to get paid.

Williams interviewed Lewis.  He corroborated that Age III hired Guillory for the Womack murder at T-Mike's repast.  He also confirmed that Wilson was the conduit through which Age III had contact with the YMF.  Indeed, according to Lewis, Age III could not have hired Guillory without Wilson's involvement because Age III did not have enough standing with the YMF on his own.  Lewis knew that Age III wanted Womack killed because he was a federal witness.  Age III did not pay Guillory all the money owed for the murder.

Williams interviewed Ayanna Age numerous times.  She cooperated with the government in the healthcare fraud case and in this case as well.  Ayanna told Williams that she met with Age Jr. and Kendrick Johnson (her ex-husband and a co-defendant in this case) regarding murdering Womack shortly after the healthcare fraud indictment was returned.  At the time, Age Jr. wanted to try to control Womack through the family lawyer, Hilliard Frazande.  Eventually, after Womack began resisting Frazande's efforts, Age Jr. told Ayanna that Womack was not going to testify, which she took to mean that her father was going to have Womack killed.  She came to know that Age III, Wilson, and Johnson were arranging the hit on Womack.  Ayanna stated that Age Jr. paid for Womack's murder.  Shortly after the murder, Wilson wanted to meet with Age Jr. because he thought Age Jr. did not pay enough for the hit.  Age Jr. commented that he gave the money to Age III and the hit-men did not know him, so he was "done with it."  Ayanna also told Williams that Womack was aware of and participated in an arson (insurance fraud) scheme arranged by her father years before the murder.

Womack told other people that Frazande was paying him to lie on Age Jr.'s behalf. Womack expressed to the judge in the healthcare fraud case that he wanted a new attorney.  A *Garcia* hearing was held, and Criminal Justice Act panel attorney Michael Fiser was appointed to represent Womack.  Frazande attempted to physically block Fiser from entering the courtroom for

the *Garcia* hearing.  Within days of switching attorneys, Womack decided to change his plea and began cooperating with the government in the healthcare fraud case.  Womack took precautions when going to meet with Fiser, such as taking the bus to Baton Rouge so he would not be in his own car.  Womack told Fiser that he was afraid of retaliation from Age Jr.

Taken as a whole, Agent Williams's testimony establishes by both a preponderance and clear-and-convincing standard of the evidence (for the purposes of the forfeiture-by-wrongdoing hearing only) that Defendants were involved in, or responsible for, procuring Womack's unavailability as an actual or potential witness and that they did so intending that result.  There is sufficient evidence, at this juncture, to establish by the applicable standards that Defendants entered into the alleged conspiracy to murder Womack to prevent his availability as a witness.  Specifically, Age Jr. paid for the hit on Womack that was arranged by Age III and Wilson, and ultimately carried out by Guillory, who all knew that Womack was a potential witness.  Throughout cross-examination Defendants attempted to cast doubt on the credibility of the witnesses Williams interviewed, particularly Ayanna and Lewis.  Their attempts were insufficient to undermine Williams's testimony that his investigation connected all Defendants to Womack's murder.

Moreover, the statements are admissible against all Defendants because the object of the conspiracy was to prevent Womack from testifying, so his murder was clearly within its scope and reasonably foreseeable.  Finally, as stated above, all of Womack's statements on any topic can be introduced, with the caveat that any other objections to admissibility, such as those under Rules 403 and 608, can and will be handled through contemporaneous objections and rulings at trial.

## IV.      CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the government's motion *in limine* to admit Womack's statements

under Rule 804(b)(6) (R. Doc. 516) is GRANTED.

New Orleans, Louisiana, this 1st day of April, 2022.


_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE